**Opinion filed July 14, 2016**



In The

# Eleventh Court of Appeals

_____

## No. 11-16-00023-CV

_____

## IN THE INTEREST OF R.C., A CHILD

**On Appeal from the 326th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 7944-CX**

### M E M O R A N D U M   O P I N I O N

The trial court entered an order in which it terminated the parental rights of the mother and the father of R.C. The mother appeals.[1] On appeal, the mother presents four issues in which she challenges the sufficiency of the evidence. We affirm.

### I. *Termination Standards and Findings*

Termination of parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2015). To determine on appeal if the evidence is legally sufficient in a parental termination case, we review

---

[1]We note that the father did not file an appeal.

all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). To terminate parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1)(A)–(T) and that termination is in the best interest of the child. FAM. § 161.001(b).

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

In this case, the trial court found that the mother committed three of the acts listed in Section 161.001(b)(1)—those found in subsections (D), (E), and (O).

2

Specifically, the trial court found that the mother had knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being; that the mother had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being; and that the mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the child, who had been in the managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent for abuse or neglect. The trial court also found, pursuant to Section 161.001(b)(2), that termination of the mother's parental rights would be in the best interest of the child.

## II. *Evidence at Trial*

The Department initially became involved with the mother in 2014 when the Department received an intake after an incident of domestic violence that occurred while R.C. was present; the mother's boyfriend, Russell Burnett, had lost his temper, choked the mother, and slammed her to the ground. R.C., who had just turned two years old, was not removed at that time; instead, the Department instituted a safety plan that day. The safety plan prohibited any unsupervised contact between R.C. and Burnett.

Eight days later, Jennifer Hudgins, the Department's investigator in the original intake, observed R.C. and R.C.'s half brother, who was approximately thirteen years old, in a parking lot for "quite a few hours" with no adult supervision, no diaper bag, and no food. Hudgins provided lunch for the children, and after a few more hours, Burnett arrived and yelled at the children to "come on." The mother was not with Burnett; he was alone in the car. Hudgins informed Burnett that he could not take the children because that would be a violation of the safety plan and that he needed to go get the mother. Burnett became hostile, causing Hudgins some

concern. Burnett left, and when he returned with the mother, the mother asked to speak to Hudgins's supervisor. Hudgins called her supervisor, and the supervisor "re-explained" the safety plan to the mother and told her that "no unsupervised contact meant no unsupervised contact, period."

About six weeks later, law enforcement personnel contacted the Department with respect to R.C. This time, Burnett physically assaulted R.C. in a grocery store parking lot. The mother was not present at that time, and R.C. had been left alone with Burnett. R.C. was taken to the emergency room, and Burnett was arrested. Photographs of R.C.'s injuries were admitted into evidence. Hudgins testified that R.C. had numerous bruises to vital areas of her body, a visible handprint on her face, and a "bruise red mark" on her thigh. The Department removed R.C. from the mother's care at that time.

The mother began participating in court-ordered services, and the trial court ordered that R.C. be returned to the mother in a monitored return but that the Department remain R.C.'s managing conservator. However, the monitored return lasted for only a few months. During the monitored return, the mother tested positive for amphetamine and methamphetamine. As a result, the Department again removed R.C. from the mother and placed R.C. back into foster care. The foster mother testified that, when R.C. got to her house after the monitored return, R.C. immediately begged to take a bath and brush her teeth. Every inch of R.C.'s body was covered with what looked like bug bites or a rash; some spots were bleeding. The following day, the foster mother took R.C. to the doctor and learned that R.C. had scabies.

The caseworker assigned to this case testified that, in general, the mother complied with the original terms of her service plan but that she did not complete counseling, did not maintain stable employment, and did not have stable housing at the time of trial. At the time of the second removal, the mother's service plan was

4

amended to add services to address the reason for that removal: the mother's use of drugs. The mother participated in some of the additional services, but she did not complete them. The mother regularly visited R.C., and those visits were appropriate. The caseworker testified that R.C. loved her mother and that they had a strong bond. Significantly, however, the mother tested positive for illegal drugs on several occasions after the second removal. One month prior to the final hearing in this case, the mother submitted to a urinalysis, which indicated recent drug use, and she tested positive for methamphetamine, amphetamine, and marihuana. One of the additions to the mother's service plan after the second removal specified that the mother "will not use drugs or alcohol and will not participate in criminal activity."

R.C., who was three years old at the time of trial, had been placed in the same foster home both times that she was removed. The testimony at trial indicated that R.C. was doing very well in that placement and that she had bonded with the foster family. R.C. was very attached to her foster mother. The foster mother testified that she intended to adopt R.C. if R.C. became available for adoption, and the Department's plan for R.C. was adoption by the foster mother. The conservatorship caseworker testified that termination of the mother's parental rights would be in R.C.'s best interest.

III. *Analysis*

*A. Sufficiency of the Evidence: Section 161.001(b)(1)*

In her first three issues, the mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings under subsections (D), (E), and (O) of Section 161.001(b)(1). The evidence indicates that the mother did not comply with the provisions of the court-ordered family service plan that specifically established the actions necessary for her to obtain the return of R.C., who had been in the managing conservatorship of the Department more than nine months as a result of her removal from the mother for abuse or neglect. The mother did not complete

5

various services, and she did not abstain from the use of illegal drugs as required by the family service plan. Additionally, R.C. was initially removed from the mother due to abuse or neglect, and the Department was the managing conservator for R.C. for almost one year. Thus, we hold that clear and convincing evidence supported the trial court's finding under subsection (O). Additionally, the Department presented clear and convincing evidence to support the trial court's finding under subsection (E) that the mother had engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being. The mother permitted Burnett, whom the mother knew was abusive, to have unsupervised contact with R.C. in violation of the safety plan. Accordingly, we hold that the evidence was both legally and factually sufficient to support the trial court's findings under subsections (E) and (O). We overrule the mother's second and third issues.

Because it must be shown that the parent has committed only one of the acts listed in Section 161.001(b)(1)(A)–(T), we need not reach the merits of the mother's first issue, which relate to subsection (D). *See* TEX. R. APP. P. 47.1.

*B. Best Interest: Section 161.001(b)(2)*

Based upon the *Holley* factors and the evidence in the record, we cannot hold that the trial court's best interest finding is not supported by clear and convincing evidence. *See Holley*, 544 S.W.2d at 371–72. The trial court could reasonably have formed a firm belief or conviction that it would be in R.C.'s best interest for her mother's parental rights to be terminated. The evidence at trial showed that the mother endangered R.C. when she exposed R.C. to Burnett, whom she knew was abusive, and knowingly permitted R.C. to be with Burnett without supervision despite the Department's safety plan. During one such unsupervised contact, Burnett assaulted R.C., which resulted in noticeable injuries to R.C. and Burnett's arrest. The record also reflects that domestic violence by Burnett against the mother

had occurred in R.C.'s presence; that the mother failed to complete her court-ordered services; that she abused methamphetamine, amphetamine, and marihuana while this case was pending; that she did not have a stable home at the time of trial; and that the child was in a safe, appropriate placement with a foster parent who wanted to adopt her. The evidence did not indicate R.C.'s wishes, but it did show that R.C. was bonded with both the mother and the foster mother. We hold that the evidence is both legally and factually sufficient to support the trial court's best interest finding. The third issue is overruled.

IV. *This Court's Ruling*

We affirm the trial court's order of termination.



MIKE WILLSON
JUSTICE


July 14, 2016

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.